JOURAS v. ALLEN, Immigration Inspector.

(Circuit Court of Appeals, Eighth Circuit. March 22, 1915.)

No. 4236.

ALIENS ⬚54—DEPORTATION—HEARING—DUE PROCESS OF LAW.

The rules of the Department of Labor require that, during the hearing, aliens arrested for deportation shall be allowed to inspect the warrant and provide that telegraphic application for a warrant of arrest may be resorted to only in case of necessity. Though an alien was quiet and in

business, and it did not appear that he had concealed his whereabouts or fled from arrest, he was arrested on a telegraphic warrant from the Department, in code, pursuant to a telegraphic application, and kept in solitary confinement from 4 p. m. Saturday until 11 a. m. Monday. The inspector then handcuffed him, and with a weapon at his command examined him in the absence of counsel and the alien's friends in an exceedingly threatening manner. He left instructions at police headquarters, where the alien was confined, not to let him see an attorney until he was given a hearing, and told a witness whose testimony was taken before the arrest that she need not come back, that the alien's attorneys would have no business to subpoena her, and that if she came back for cross-examination and made any change in her testimony, she would be guilty of perjury and would be sent "over the road." He also told the alien's partner, who was going to the hearing to help defend him, not to go. *Held*, that the inspector's course of action was arbitrary, contrary to the rule regarding telegraphic applications, and a clear abuse of his discretion, and the hearing was unfair and denied the alien due process of law.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 112; Dec. Dig. ☞54.]

Appeal from the District Court of the United States for the Western District of Missouri; Arba S. Van Valkenburgh, Judge.

Petition by Gust Jouras for a writ of habeas corpus against Harry C. Allen, Immigration Inspector. From an order denying the petition, the petitioner appeals. Reversed, with directions.

Charles M. Blackmar, of Kansas City, Mo. (Henry A. Bundschu, of Kansas City, Mo., on the brief), for appellant.

Sam O. Hargus, Asst. U. S. Atty., of Kansas City, Mo. (Francis M. Wilson, U. S. Atty., of Kansas City, Mo., on the brief), for appellee.

Before SANBORN, ADAMS, and SMITH, Circuit Judges.

SANBORN, Circuit Judge. This is an appeal from an order denying the petition for a writ of habeas corpus to release Gust Jouras, a resident alien, from confinement under an order of deportation upon the charge that he had been found receiving, sharing, and deriving benefit from the earnings of a prostitute or prostitutes. The Acts of Congress, the principles of jurisprudence, and the rules of law and practice applicable to this case may be found in the opinion in Whitfield v. Hanges, 222 Fed. 745, —— C. C. A. ——, filed herewith, and reference is made to that opinion for them.

Gust Jouras is a Greek. He entered the United States in accordance with its laws in 1903, when he was about 16 years of age, and has resided in it ever since. For 5 years prior to his arrest by the inspector he lived in Kansas City. He was, and long had been, engaged in operating restaurants and lunch wagons in that city, and at the time of his arrest he and his two partners were the owners of two restaurants worth $1,500, which they were operating. The record convinces that he was a quiet, peaceable business boy. There is no evidence that he was violent, passionate, or dangerous, or that he ever concealed, or intended to conceal, his whereabouts, or to flee or clandestinely escape from any charge or arrest. Prior to January 5, 1914, the inspector took the ex parte statements of Mrs. Brown and other prostitutes in

reference to the charge subsequently made against Jouras, and on that day made a telegraphic application for a telegraphic warrant of arrest. He received such a warrant of arrest which read in this way:

"Arrow Gust Jouras receiptor relay thirty.          W. B. Wilson, Secy.
"4:05 P. M."

The meaning of this statement is said by the inspector to be:

"Arrest following named alien (Gust Jouras) and bring before yourself for hearing, forwarding record of proceedings to the department; alien found receiving, sharing in and deriving benefit from the earnings of a prostitute or prostitutes. Authority granted for release under bond in the sum of three thousand dollars."

Rule 22b of the Department of Labor requires that during the hearing the alien shall be allowed to inspect the warrant. The purposes of that portion of that rule are to inform the accused of the genuineness of the signature to the warrant and of the charges against him. But such a telegraphic warrant in a code of which the alien is ignorant accomplishes neither of these objects. The signature to it is not the genuine signature of the Secretary, or any officer, and the telegram gives the accused no information. Hence rule 22, subdivision 2, requires that "Telegraphic application may be resorted to only in case of necessity." There was neither necessity nor reason for a telegraphic application in this case. But the inspector having made a telegraphic application and procured the telegraphic warrant, at about 4 p. m. on Saturday, January 5, 1914, went to Jouras' restaurant, seized him, and caused him to be thrown into and kept in solitary confinement in a dark cell at police headquarters "for investigation" during Saturday night, Sunday, Sunday night, and until Monday at 11 a. m., when he took him to his room, handcuffed him, and with a weapon at his command, gave him a hearing there without counsel or friend, which consisted of questioning him in an exceedingly threatening manner, and writing down what he succeeded in extracting from him. This course of action was arbitrary, contrary to the rule regarding telegraphic applications, a clear abuse of the discretion of the inspector, and a hearing thus conducted is unfair and contrary to the fundamental principles which inhere in due process of law. United States v. Ruiz, 203 Fed. 441, 443, 121 C. C. A. 551.

Before the arrest of Jouras the inspector examined Mrs. Brown, and in answer to her question whether or not she would have to come back at the hearing of Jouras, he replied: "No, I have your statement. I don't need you any more." Mrs. Brown testified that he also said:

"Of course, if you want to take chances on coming here on cross-examination and you make one mistake in your statement, that for you [witness snapping her finger]—over the road; and you know what that means. Furthermore, those lawyers that the Greeks have have no business to serve a subpœna on you—have no right whatever, and if they serve it, you take it and bring it to me."

She testified that she understood that "over the road for you" meant "you to the penitentiary." After the arrest and before the hearing was concluded Mrs. Brown went to the inspector and asked him if she could do anything to help Jouras, and he said:

"No, Mrs. Brown, you can't help him, all the money in the world if Christ was here wouldn't save him.  *  *  *  He told me if I came up there and made one mistake in that statement that I would go over the road; that the lawyers and all the witnesses could do whatever they liked, but if they fooled with him he would perjure every one of them."

George Boutulas, a partner of Jouras, who was going to the hearing to help defend him, testified that the inspector told him not to go any more because they (the lawyers) were looking after our money. The character of the testimony of the inspector is well disclosed by the following excerpt from his cross-examination:

"Q. Did you have any particular reason in keeping him down there for two days before taking his statement? A. Nothing particular. Just to keep him until I could get ready. The law provides to keep them in a safe place. It does not specify any particular jail. Q. You didn't have any particular object in taking him down there and booking him for investigation? A. I didn't know the man. Q. Did you bring him to your office? A. I don't know whether I did or not. Q. Personally I mean. A. I forget whether I did or not. Q. As a matter of fact, you did bring him there and put handcuffs upon him there? A. No question; if I brought him myself. Q. You showed some kind of a weapon to him and told him that if he tried any funny business you would get him? A. I would judge the character described—he was a dangerous man. Q. You told him that? A. I could when it is necessary. I never tell what I might do. Q. You assumed a very threatening manner towards him? A. I necessarily would. That is probably my natural attitude. I am nervous. Q. Didn't you tell him the dagoes in Chicago had tried the same business and you would kill him? A. I have been in close quarters, on the Canadian border, with Japanese, Chinese, etc. Q. Did you tell him in words? A. No; I don't have to intimidate anybody. Q. You say that you didn't intimidate him? A. No. Q. Mrs. Brown came to you, and told you that she didn't tell what was true, didn't she? A. I don't know whether she did or not. She came back and said she didn't want to get him in trouble. Q. At that time you told her she was guilty of perjury, and it was over the road for her? A. I told her positively if she changed her statement she was guilty of perjury, and I would take the case up with the officials. Q. Yes, sir; and that she had better not come back for cross-examination? A. Positively no. My memory is very clear. Q. Did you leave instructions at police headquarters? A. Not to see any attorney until such time as he was given a hearing. Q. You told them down there not to see any friends? A. Not—"

That is not a fair hearing in which the inspector by threats and notices to witnesses prevents their attendance at the hearing, or prevents their testimony, or prevents the correction of their previous testimony. Chin Yow v. United States, 208 U. S. 8, 11, 12, 28 Sup. Ct. 201, 52 L. Ed. 369; United States v. Sibray (C. C.) 178 Fed. 144, 149; United States v. Williams (D. C.) 185 Fed. 598, 604.

Let the order from which the appeal was taken be reversed, let the court below admit the prisoner to bail and proceed to try the merits of the charges as indicated in Chin Yow v. United States, 208 U. S. 8, 13, 28 Sup. Ct. 201, 52 L. Ed. 369; United States v. Williams (D. C.) 193 Fed. 228, 230, 231, 232; In re Can Pon, 168 Fed. 479, 483, 484, 93 C. C. A. 635; Ex parte Petkos (D. C.) 212 Fed. 275, 278; Ex parte Koerner (C. C.) 176 Fed. 478, 479.